1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

8   DANIEL JOHN WILCKEN,

9                          Petitioner,          Case No. C18-0279-RSL-MAT

10         v.

11  RONALD HAYNES,                              REPORT AND RECOMMENDATION

12                          Respondent.

13

14              INTRODUCTION AND SUMMARY CONCLUSION

15       This is a federal habeas action filed under 28 U.S.C. § 2254.  Petitioner Daniel Wilcken

16  seeks to challenge in this action his 2014 King County Superior Court judgment and sentence.

17  Respondent filed an answer to petitioner's habeas petition together with relevant portions of the

18  state court record, and petitioner filed a response to respondent's answer.  This Court, having

19  reviewed the submissions of the parties, concludes that this federal habeas action should be

20  dismissed as untimely under 28 U.S.C. § 2244(d).

21                       FACTUAL BACKGROUND

22       The Washington Court of Appeals, on direct appeal, summarized the facts underlying

23  petitioner's convictions as follows:

REPORT AND RECOMMENDATION
PAGE - 1

Wilcken has two daughters who were elementary and middle-school aged at the time of the offenses. HJ met Wilcken's younger daughter at school when she was 10 years old. HJ and Wilcken's younger daughter became friends and HJ frequently slept over at the Wilcken's home. One night, when HJ was 12 years old, she woke up to discover Wilcken in bed with her. Wilcken had his hand inside her underwear and his fingers were tangled in her pubic hair. The following morning, Wilcken apologized. HJ did not know what to do and was worried that she would get into trouble if she told anyone.

On another occasion, HJ fell asleep on Wilcken's living room couch. HJ woke up to discover Wilcken attempting to pull her pants off. HJ pretended to be asleep, and eventually Wilcken abandoned the attempt.

Wilcken told HJ he was writing and producing a television show and offered to let HJ star in it. Wilcken told HJ he needed to create a "digital stunt double" of her and to do so, he needed to photograph her in the nude. Wilcken took nude photographs of HJ on several occasions. On one of these occasions, Wilcken groped and twisted HJ's nipple. Wilcken also asked HJ if he could kiss her and take a close-up photograph of her vagina. These events involving HJ were the basis for count 1, child molestation in the second degree.

CS met Wilcken's older daughter at church when she was 12 years old. CS quickly became close to Wilcken's older daughter because she did not have many friends and because the two girls had a shared interest. Like HJ, CS was frequently invited to spend the night at Wilcken's home. On her first overnight visit, CS woke to Wilcken straddling her. CS noticed that her pajama shirt was pulled up, exposing her chest, and Wilcken had his hand in her pajama pants, over her underwear. CS grabbed her clothes and ran into the bathroom. When CS came out, Wilcken asked CS "if it felt good," and CS said no. Wilcken told CS not to tell anyone about the incident. He then took CS to a store and offered to buy her a DVD if she agreed not to tell anyone. Afraid to lose her friendship with her only friend, CS continued to regularly spend the night at Wilcken's house but would wrap herself tightly in blankets and sleep as close to Wilcken's older daughter as she could.

On three subsequent occasions, CS awoke to find Wilcken standing in the corner of the room.

Wilcken told CS he wanted her to star in a movie that he had written. He told her he wanted to create a "virtual character" of her and to do so he would need to photograph her entire body in the nude. CS refused. Wilcken later showed CS nude photos he had taken of his two daughters. These events involving CS were the basis for count 2, attempted child molestation in the second degree.

SE met Wilcken's younger daughter at school when she was 10 years old. They quickly became friends. SE began spending the night at Wilcken's house two

REPORT AND RECOMMENDATION
PAGE - 2

or three times a month.  One night, Wilcken entered the room where SE was sleeping.  Wilcken told SE to "scoot over" and lay down next to her.  He put his hand inside her pajama pants and underwear and rubbed her vaginal area.  SE pretended to be asleep "because it was a very confusing situation for me and I wasn't sure if I was supposed to know or react."  Wilcken told SE "not to tell [her] family because they wouldn't understand."  Wilcken frequently told SE that his family loved and appreciated her.

Wilcken told SE that he was making a movie and needed some "anatomy references" for his "animation program."  He asked to photograph SE in the nude.  SE was uncomfortable but agreed because Wilcken was also photographing his younger daughter in the nude and because she wanted the Wilcken family to continue to like her.  These events involving SE were the basis for count 3, child molestation in the first degree.

When TW was eight she met Wilcken's older daughter at school.  The girls quickly became best friends, and TW went to Wilcken's home nearly every day.  Wilcken told TW's family that he worked with other celebrities and that he "had some connections" and would be able to get TW into modeling.  According to TW's older sister, Wilcken took photos of TW in which she was "partially dressed," wearing "bikini tops, booty shorts" and "bent over" with her "legs spread open."  Wilcken described himself as TW's "manager" and bought TW expensive gifts such as clothes, roller blades, and a bracelet.

One night, when TW was 11 years old, she woke up to Wilcken pulling her shirt up and exposing her breasts.  TW pretended she was asleep and rolled away from Wilcken.  TW called her mother and went home.  On several subsequent occasions, while showering at Wilcken's home, TW noticed Wilcken watching her through the bathroom window.  These events involving TW were the basis for count 4, attempted child molestation in the second degree.

JB's mother, DB, dated Wilcken in the 1980s and remained friends with Wilcken.  JB's family frequently stayed overnight at Wilcken's home.  On one occasion, when JB was nine years old, she woke up to find Wilcken rubbing her breasts and lower torso underneath her pajamas.  JB rolled away and told her mother the next morning.  JB and her family did not ever go back to Wilcken's house.  These events involving JB were the basis for count 5, child molestation in the first degree.

When interviewed by law enforcement, CS, HJ, and SE initially denied that anything had happened at Wilcken's house but later admitted Wilcken had molested them.

The State charged Wilcken with child molestation in the second degree (count 1), attempted child molestation in the second degree (count 2), child

REPORT AND RECOMMENDATION
PAGE - 3

molestation in the first degree (count 3), attempted child molestation in the second degree (count 4), and child molestation in the first degree (count 5). A jury convicted Wilcken on counts 1 through 4 but acquitted him of count 5, the count involving JB.

(Dkt. 16, Ex. 2 at 1-5.)

PROCEDURAL BACKGROUND

Petitioner appealed his convictions to the Washington Court of Appeals, and the Court of Appeals issued an unpublished opinion affirming the convictions on May 11, 2015. (*See id.*, Exs. 2-5.) Petitioner thereafter moved for reconsideration of the Court of Appeals' decision, and that motion was denied on June 18, 2015. (*Id.*, Exs. 6-7.) Petitioner did not seek further review by the Washington Supreme Court, and the Court of Appeals issued a mandate terminating direct review on July 31, 2015. (*Id.*, Ex. 8.)

On August 1, 2016, petitioner filed a personal restraint petition in the Washington Court of Appeals. (*Id.*, Ex. 9.) The Acting Chief Judge of the Court of Appeals issued an order dismissing the petition on April 25, 2017. (*Id.*, Ex. 12.) Petitioner thereafter sought review in the Washington Supreme Court, and the Supreme Court Commissioner issued a ruling denying review on September 5, 2017. (*See id.*, Exs. 13-14.) Petitioner moved to modify the Commissioner's ruling, and that motion was denied on December 6, 2017. (*Id.*, Exs. 15-16.) The Court of Appeals issued a certificate of finality in petitioner's personal restraint proceedings on December 22, 2017. (*See id.*, Ex. 17.)

Petitioner now seeks federal habeas review of his convictions. Petitioner apparently executed his federal habeas petition on or about February 17, 2018, and the petition was received

REPORT AND RECOMMENDATION
PAGE - 4

by the Court for filing on February 23, 2018.[1]  (*See* Dkt. 1.)

GROUND FOR RELIEF

Petitioner identifies a single ground for relief in his federal habeas petition:

GROUND ONE:  Petitioner received ineffective assistance of counsel in deprivation of rights guaranteed by the Sixth, and Fourteenth Amendments to the U.S. Constitution.

Supporting facts:  Petitioner informed defense counsel that he wanted to present status defense, whereas, Petitioner was diagnosed with central- and obstructive sleep apnea, and post-traumatic stress disorder.  More specifically, Petitioner was prescribed Ambien, which caused petitioner to sleep-walk during the night. Petitioner's liver-failure affected the amount of Ambien in his body, which led to further trauma of an extremely severe and prolonged nature.

(Dkt. 8 at 5.)

DISCUSSION

Respondent argues in his answer to petitioner's federal habeas petition that the petition is untimely under the federal statute of limitations, 28 U.S.C. § 2244(d), and should therefore be dismissed.  (*See* Dkt. 13 at 9-14.)  Pursuant to §2244(d)(1), a one year period of limitation applies to an application for a writ of habeas corpus filed by a person in custody pursuant to the judgment of a state court.  The one year limitation period generally begins to run from the date of the conclusion of direct review or "the expiration of the time for seeking such [direct] review," whichever is longer.  28 U.S.C. § 2244(d)(1)(A).

In this case, the period for direct review ended, at the latest, upon the expiration of the

---

[1]  Petitioner failed to sign his petition before submitting it to the Court for filing.  The Clerk sent plaintiff a letter advising him of this and other deficiencies, and petitioner corrected the deficiencies on March 6, 2018.  (*See* Dkts. 2, 6.)  The signature page submitted by petitioner on March 6, 2018 indicates that petitioner executed his petition on February 17, 2018.  (*See* Dkt. 6.)  Nothing in the record explains why it took almost a week for petitioner's petition to reach the Court (from February 17, 2018 when petitioner claims he signed the petition, until February 23, 2018 when the petition was actually received by the Court).

REPORT AND RECOMMENDATION
PAGE - 5

period for seeking review by the Washington Supreme Court of the Washington Court of Appeals'

decision affirming petitioner's convictions. *Gonzalez v. Thaler*, 565 U.S. 134, 150 (2012). The

Court of Appeals issued its opinion affirming petitioner's judgment and sentence on May 11, 2015.

(*See* Dkt. 16, Ex. 2.) Petitioner had 30 days from that date to file a petition for review. *See* Rule

13.4(a), Washington Rules of Appellate Procedure. Because petitioner did not file a petition for

review, his conviction became final on or about June 10, 2015. 28 U.S.C. § 2244(d)(1)(A).

Petitioner's one year statute of limitations began to run on the following day, and expired one year

later on June 10, 2016. *See Corjasso v. Ayers*, 278 F.3d 874, 877 (9th Cir. 2002).

The one year limitations period is tolled for any "properly filed" collateral state challenge

to the state conviction. 28 U.S.C. § 2244(d)(2). Giving petitioner the benefit of the "mailbox

rule," petitioner's personal restraint petition was filed in the Washington Court of Appeals on July

28, 2016, the date petitioner signed the petition and presumably delivered it to prison staff for

mailing.[2] Because petitioner clearly did not file his personal restraint petition in the state courts

until after the federal statute of limitations had already expired, petitioner's state court collateral

proceedings did not act to toll the limitations period.

The statute of limitations governing federal habeas petitions is also subject to equitable

tolling. *Holland v. Florida*, 560 U.S. 631 (2010). However, the Ninth Circuit has made clear that

equitable tolling is available "only when extraordinary circumstances beyond a prisoner's control

make it impossible to file a petition on time and the extraordinary circumstances were the cause of

his untimeliness." *Laws v. Lamarque*, 351 F.3d 919, 922 (9th Cir. 2003) (internal quotation and

---

[2] Under the "mailbox rule," a pleading is deemed filed when the prisoner delivers it to the prison authorities for mailing to the clerk of court. *See Houston v. Lack*, 487 U.S. 266, 276 (1988); *Stillman v. LaMarque*, 319 F.3d 1199, 1201 (9th Cir. 2003).

REPORT AND RECOMMENDATION
PAGE - 6

citation omitted).  Petitioner does not argue that he is entitled to equitable tolling, asserting in his response to respondent's answer only that he was unaware of the limitations period.  (Dkt. 18 at 7.)  This lack of awareness does not constitute the type of "extraordinary circumstance" that would entitle petitioner to equitable tolling.  *Raspberry v. Garcia*, 448 F.3d 1150, 1154 (9th Cir. 2006) (holding that "a *pro se* petitioner's lack of legal sophistication is not, by itself, an extraordinary circumstance"); *Ford v. Pliler*, 590 F.3d 782, 789 (9th Cir. 2009) (observing that the equitable tolling "standard has never been satisfied by a petitioner's confusion or ignorance of the law alone").

Petitioner does argue, however, that he has made specific factual allegations which, if proven to be true, would establish his actual innocence and thereby provide a gateway for consideration of his otherwise time-barred constitutional claim.  (*See* Dkt. 18 at 7-9.)  There is an equitable exception to the statute of limitations for a credible showing of actual innocence. *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013).  However, the Supreme Court has cautioned that tenable actual innocence claims are rare.  *Id*.  "[A] petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt."  *Id.* (quoting *Schlup v. Delo*, 513 U.S. 298, 329 (1995)); *see also House v. Bell*, 547 U.S. 518, 538 (2006) (emphasizing that the *Schlup* standard is demanding and rarely met).  In order to make a credible claim of actual innocence, a petitioner must "support his allegations of constitutional error with new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial."  *Schlup*, 513 U.S. at 324.

Petitioner's claim of actual innocence is based on his assertion that his use of the drug Ambien, a sleep medication, affected his mental state such that he could not have formed the intent

REPORT AND RECOMMENDATION
PAGE - 7

1    to commit the two counts of attempted child molestation in the second degree of which he was

2    convicted.  (*See* Dkt. 18 at 4-6.)  According to petitioner, he informed his defense counsel that if

3    the incidents which gave rise to the charges against him occurred during the night, the Ambien

4    affected his decision making functions.  (*Id*. at 5.)   Petitioner claims that he specifically asked

5    counsel to investigate an involuntary intoxication defense based on his use of Ambien, and he

6    provided counsel with the name of his physician, Dr. Vishesh Kapur, who had previously

7    diagnosed petitioner with central sleep apnea, post-traumatic stress disorder, and obstructive sleep

8    apnea.  (*Id*.)

9         Petitioner asserts that counsel made no effort to interview his physician or obtain his

10   medical records, and that if Dr. Kapur had been consulted he would likely have concluded that "it

11   is 'medically probable' that Wilckens' parasomnia meets the definition of 'mental illness' at the

12   time of the alleged incident, because Zolpidem impairs an individuals [sic] ability to formulate

13   thoughts, analyze or respond to his environment, control impulses, appreciate the wrongfulness of

14   his actions, or control his behavior."  (*Id*. at 6, 9.)  Petitioner maintains that such testimony from a

15   qualified expert would have made a difference in the outcome of his trial.  (*Id*.)

16        The Court first notes that while petitioner believes Dr. Kapur would have provided support

17   for a viable involuntary intoxication defense, he provides no credible evidence to support that

18   belief.   There is no affidavit in the record from Dr. Kapur, or any other expert, regarding the

19   potential effect of petitioner's Ambien use on the charges leveled against him.   Petitioner did

20   submit to the state courts in support of his personal restraint petition clinical notes from

21   appointments he had with Dr. Kapur in 2001, 2002, 2008, 2009 and 2013.  (*See* Dkt. 16, Ex. 11,

22   Appendix A.)  But those notes establish, at most, that petitioner took Ambien intermittently during

23   the period of time his crimes were committed (from June 3, 2002 to July 7, 2008), and that he

REPORT AND RECOMMENDATION
PAGE - 8

reported experiencing some degree of amnesia the day following his ingestion of the medication. (*See id.*) Nothing in those notes even hints at the possibility that petitioner's use of Ambien could have rendered him unable to form the intent to commit the crimes, and his suggestion that Dr. Kapur would have offered such an opinion if called to testify is speculative at best.

Moreover, though the evidence in the record reflects that the charged conduct occurred at night while the young girls were sleeping, there was also a significant amount of evidence at trial of sexualized behavior directed towards the child victims, including kissing and photographing their nude bodies and genitalia, that did not occur at night. In addition, there was testimony from at least some of the victims suggesting petitioner was indeed aware of the conduct he had engaged in during the night time incidents. CS testified that petitioner talked to her about the touching incident a short time after it occurred, and told her not to tell anyone. (Dkt. 24-2 at 141.) CS further testified that the day following the incident, petitioner offered to buy her a DVD if she would agree not to talk about the incident. (*Id.* at 142.) SE likewise testified that petitioner had told her not to tell her family about what had happened between them "because they wouldn't understand." (*Id.* at 429.) Finally, HJ testified that petitioner apologized for his conduct the day after he had inappropriately touched her. (*See* Dkt. 24-3 at 69-70.)

Given the testimony that some of the sexual interest petitioner expressed toward the victims occurred during daylight hours, and the testimony that petitioner apologized for his actions and/or cautioned his victims not to talk about the inappropriate touching, it is doubtful that a mental status defense such as the one suggested by petitioner would have gained any traction with the jury. In sum, petitioner fails to persuade this Court that no reasonable juror would have convicted him in light of evidence of his intermittent use of Ambien over the six year period of time during which his crimes were committed. Petitioner's claim of actual innocence therefore fails.

REPORT AND RECOMMENDATION
PAGE - 9

Because petitioner filed his petition outside of the § 2254 statute of limitations period, and because petitioner has not demonstrated that he is entitled to any tolling of the limitations period or that he is exempt from the statute of limitations because of his "actual innocence," petitioner's petition is time-barred and must therefore be dismissed.

Certificate of Appealability

A petitioner seeking post-conviction relief under § 2254 may appeal a district court's dismissal of his federal habeas petition only after obtaining a certificate of appealability from a district or circuit judge. A certificate of appealability may issue only where a petitioner has made "a substantial showing of the denial of a constitutional right." See 28 U.S.C. § 2253(c)(3). A petitioner satisfies this standard "by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). Under this standard, this Court concludes that petitioner is not entitled to a certificate of appealability in this matter.

CONCLUSION

For the reasons set forth above, this Court recommends that petitioner's petition for writ of habeas corpus, and this action, be dismissed with prejudice. This Court further recommends that a certificate of appealability be denied. A proposed order accompanies this Report and Recommendation.

OBJECTIONS

Objections to this Report and Recommendation, if any, should be filed with the Clerk and served upon all parties to this suit within **twenty-one (21) days** of the date on which this Report and Recommendation is signed. Failure to file objections within the specified time may affect

REPORT AND RECOMMENDATION
PAGE - 10

your right to appeal.  Objections should be noted for consideration on the District Judge's motions calendar for the third Friday after they are filed.  Responses to objections may be filed within **fourteen (14) days** after service of objections.  If no timely objections are filed, the matter will be ready for consideration by the District Judge on December 14, 2018.

DATED this 20th day of November, 2018.

Mary Alice Theiler
United States Magistrate Judge

REPORT AND RECOMMENDATION
PAGE - 11